Our first case for the morning is Sattazahn v. Secretary. It is number 21-2372. Will you be reserving any time? Yes, please, Your Honor. Two minutes. That will be granted. Thank you. Thank you. May it please the Court, my name is Samuel Angel and I represent David Sattazahn, who is the appellant. The case is very simple. The appeal before the Court. The trial prosecutor suppressed two very important pieces of evidence. One was an inducement, one was an inconsistent statement. Excuse me, trial counsel was Mr. Baldwin, correct? Trial prosecutor? Yes, but he was not at that time the District Attorney, is that right? He was the District Attorney at that time. He was the District Attorney. He was not the District Attorney at the time of the first trial. Yes, Your Honor. That's correct. Thank you. At trial, one of the two witnesses who testified that Mr. Sattazahn was the shooter was Fritz Swanner. And Fritz Swanner testified that David Sattazahn confessed to shooting the victim, Mr. Boyer, in this case. On the witness stand, under oath, Mr. Swanner denied having any expectation of or thinking that he was going to get some kind of reward for his testimony. Mr. Angel, as we all know, in these cases, the AEDPA standards of review do a lot of the heavy lifting. So there are only two issues in this case, a Brady and a Brady-Diglio issue. Yes, Your Honor. So with respect to the issue you're arguing right now, what standard of review did the District Court apply and should we be applying? With respect to the issue right now, the District Court applied an AEDPA review, Your Honor. And Your Honor— Applied what? An AEDPA, A-E-D-P-A. Yeah, I mean, what standard of review under AEDPA? Well, the standard of review under AEDPA is— Was it a no vote or was— A law applied by the State Court that was contrary to clearly established federal law. And then the District Court has to look at also whether there's unreasonable determination of fact. And here, the District Court fairly deferred to the State Court findings, and it's our position that both those facts— That's what I was getting to. Yes. The District Court employed a deferential standard of review. Yes, Your Honor. Is that correct? Yes. Is that what we should do? Your Honor, we'll need to look at AEDPA, and I respectfully submit that AEDPA was not—that Mr. Sadezan passes the AEDPA test for a number of reasons. The biggest point made by the District Court and State Courts was that there was not an inducement given here. And that just doesn't hold up. That's an unreasonable determination of fact. Is there any law from either the Supreme Court or from this Court indicating that a vague inducement is something that would need to be handed over or made available by the prosecution? Yes, Your Honor. What is the case? Bagley v. Bagley, the Bagley case, and also the Giglio case, Your Honor, both of those two cases. A vague inducement. Not an agreement. A vague inducement. In Bagley, the Court said that evidence of interest or bias is impeachment evidence that must be turned over. Evidence of interest or bias is impeachment evidence. And we know under Kiles—I think Kiles fits into this, too, Judge Smith—Kiles says that impeachment or exculpatory evidence, straight-up exculpatory evidence, comes. Isn't Bagley a little bit different than this case? I mean, there was money that was being offered for favorable determination. There's nothing like that in this case, is there? I think the cases are very parallel, Your Honor. In Bagley, the contracts were blank contracts. That's what Mr. Baldwin offered Mr. Warner here, a blank contract. I'll see what I can do in your case coming up. That's a blank contract. Those contracts— What were the exact words? I'm sorry? The exact words, I'll see what I can do? In your case, there are no deals, but I will see what I can do in your case coming up. So the but no your deals is what Mr. Warner testified to at trial. No deals. And that was accurate testimony? That was accurate, but there was more to it than that, because he was asked, do you have any expectation of a reward? He said no. He was asked, do you think you're going to get a reward? He said no. But the jury— Three weeks later, excuse me. The jury knew about his situation. He was facing other charges. The jury didn't know about his situation, Your Honor. Actually, the jury knew a lot about his situation. In reading his testimony, and of course most especially the cross-examination, which I think takes up three to four pages of transcript, they heard a long litany of charges and convictions, beginning with a juvenile prosecution, if I recall, down through convictions for theft by unlawful taking, receiving stolen property. Doesn't that get us to the materiality question here? Isn't that what this ends up really all about? So how was that testimony material? How was the false testimony material, Your Honor? The false testimony was material because the jury was deprived of knowing that Mr. Wanner was lying about what— That doesn't say why it's material. That just says what we already know, that the jury was not given the information. Doesn't Bagley come into this inquiry? That is, the evidence has to be material only if there's a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. You agree with that? That is the Bagley standard under Brady. There's also the more defense-friendly standard under NAPU, and that standard is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Bagley speaks to reasonable probability. Reasonable probability is a probability sufficient to undermine confidence in the outcome. How could this have possibly undermined the outcome or undermined the confidence in the outcome here, given the long litany of prior convictions, along with the relative insignificance of the difference between how Wanner recounts the conversation in the barn and how Hammer recounts it? With respect, Mr. Wanner was presented as someone who did not have an incentive from the Commonwealth. He denied having an incentive from the Commonwealth. That was the very end of his direct testimony. How would you have used this information if you had had it? I would have used it to argue to the jury as follows, Your Honor. I would have argued to the jury that Mr. Wanner was not trustworthy, and I would have combined that with the inconsistent statement from Mr. Hammer, who said that Mr. Sadasan did not confess. Would you then have been leaving the implication to the jury that, well, you can believe Hammer for all of this except for who held the gun first, or you can believe Wanner for everything except for who held the gun at the beginning? How does that help you? It helps because it takes away Mr. Sadasan's confession. Fritz Wanner is the only witness who testified to Sadasan confessing to shooting the crime, and confession is important evidence, as the Court knows. Also, Fritz Wanner is the only other witness besides Hammer, who is a corrupt and polluted source, who says that David Sadasan was there and who says that David Sadasan shot the victim. That's very important evidence. You take that away and you have problems. The Commonwealth has problems, both of its witnesses. The Commonwealth is putting up two witnesses, Fritz Wanner and Jeffrey Hammer, and now they're contradicting each other. On what? On whether David Sadasan confessed. That's important. Confessed? Confessed. Confessed to shooting the victim. Confessed to being the shooter. That's very important because from that, counsel can say that there's a reasonable doubt here, jury. There's a reasonable doubt because even the Commonwealth's own witnesses don't agree on whether there's a confession. Commonwealth's witnesses both agreed there was a conversation, right? Yes. And where it took place, right? Yes. And they both agreed or there was no disagreement about Sadasan threatening Mr. Hammer, right? That's correct. And they both, both accounts of the conversation agreed to a .22 caliber handgun being present, right? I'm not sure that Mr. Wanner agreed to that. Mr. Wanner's testimony was that Mr. Sadasan had to pick up the gun and- A handgun. Right. The disagreement was, there was no disagreement. Was there in those, between those two statements as to who actually fired that gun? Well, except that Mr. Baldwin did not turn over these notes. Well, sure, I know that. And from following up on those notes, I'm sorry, Your Honor. No, no, go ahead. From following up on those notes, counsel would have learned that Mr. Hammer would testify that David Sadasan never confessed to shooting the victim in that conversation. That's important. That's huge. And so you have the, that's big evidence. And then, so you have the Commonwealth's witnesses giving contrary testimony about whether there's a confession from Mr. Sadasan. And from there, Your Honors, you could say that Mr. Hammer is not credible because he's a corrupt and polluted source. And you could say that it could have affected the verdict. That's what I would argue to the jury. They can't, they can't agree on whether Mr. Sadasan made the statement. Mr. Hammer is a corrupt and polluted source. And Mr. Wanner is lying about whether or not he had a, whether or not he had an inducement. And Mr., and that. Counsel, your reliance on Wanner's testimony, it's a little curious to me. On appeal now, you're pointing out it's critically important. I think in your brief you called him the, quote, unquote, dispositive witness. Yet at closing argument, and I read it, I mean, Wanner's testimony isn't even mentioned. And, in fact, counsel said that Hammer was the main witness in the case. Doesn't this undermine your position about the importance of Wanner's testimony? Well, I think Your Honor is referring to defense counsel's closing? Yes. I would, there is a reference to defense, in defense counsel's closing to Mr. Wanner. And defense counsel didn't have all the information available to him that he should have had available to dispute Wanner. And if he had more, he would have used it. And defense counsel John Adams said at his PCRA testimony that if I had had this, I would have used it. It would have affected the defense. And also Mr. Baldwin, who was a DA, he did rely on Wanner. And he said, Wanner is like the evidence, the other physical evidence we have here. Circumstantial evidence supporting my case. And he specifically relied on it. And counsel didn't have the information available to shoot it down. I see I'm running out of time. I would just ask the court to consider that there's no physical evidence that says that Mr. Sadasan was there at the scene. No physical evidence that says he was a shooter. There's forensic evidence that says that a .22 caliber shell was the cause of death to Mr. Boyer, right? Yes. And there is testimony from the owner of a gun shop that Mr. Sadasan purchased a .22 caliber weapon, right? That's correct. And in fact, that weapon was tied to the weapon that was eventually found by law enforcement. That's correct. And if I may add to that, Your Honor, that Hammer was there when the gun was bought. That's undisputed. Hammer was too young to buy the gun. Who bought the gun? Mr. Sadasan bought the gun. Mr. Hammer was present. Mr. Hammer was 19 years old. Mr. Sadasan was roughly three years older, so he was older than 21. To buy a handgun under federal law, he had to be 21. Mr. Hammer was not 21 at the time. And so Harold Hauser, who was a defense witness, testified that Mr. Hammer in jail said David Sadasan bought him a gun. It was a small caliber gun, either a .22 or a .25. The evidence convicting Mr. Sadasan of murder one and other crimes was flawed because of the prosecution's failure to disclose evidence to discredit Wanner and the Commonwealth's case. Mr. Angell, just one final question for me, and that is relative to what you just said about Mr. Wanner. Mr. Wanner did not testify in the first trial, right? That's correct. And yet the jury still convicted Mr. Sadasan of first-degree murder. Yes, and that verdict was reversed because of an unconstitutional… On an instruction issue that had absolutely nothing to do with the issues that you're addressing right now. Well, I disagree, Your Honor. It had to do with whether there was intent to kill him. It had to do with whether there was intent to kill him. And so there was an intent issue, and it was reversed. I don't think that does not salvage that case from the Commonwealth's standpoint. I request that the Court grant the writ and correct this grave injustice. Thank you, Your Honor. Thank you, Counsel. You may proceed. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Hugh Burns for the Commonwealth. Sadasan argues that it's important to impeach Fritz Wanner's claim that he overheard Sadasan say to Jeffrey Hammer that Sadasan had to grab the gun from Hammer in order to shoot the victim because Hammer missed. That part of Wanner's testimony, however, is at odds with Hammer's direct testimony at trial. What about our standard of review, as I ask your adversary, under the AEDPA? I would argue that that deferential standard, which was applied to the second issue, should apply to this issue, too. Actually, on this issue, the District Court didn't apply the deferential standard. It ruled in our favor under a de novo standard, which was good for us, but technically, in our appeal, we would argue that the deferential standard should apply to both claims. A little background on that. In the District Court, the District Court said that the Supreme Court of Pennsylvania applied an incorrect rule. It said that the Supreme Court said that Brady information is known to the defendant. It's not suppressive. It's known to the defendant, or if the defendant can obtain it through the exercise of reasonable diligence. We know from the Dennis case, the en banc case of this Court, that the part after the or is wrong, but that's not the part that the State Supreme Court applied. It applied the part before the or, which Dennis says is right. So the Supreme Court didn't say that Sadezan had to exercise diligence to find out whether Wanner was misquoting him. It held that. And to be clear, the Supreme Court of Pennsylvania did not at that time have the benefit of our Dennis case. That's true. Although, even if it had, it didn't apply the wrong part. It applied the right part and said that if it was true, as Sadezan claimed, that Wanner was misquoting him, Sadezan would have known that of his own independent knowledge. He would have known that Hammer knew it. And so under that test, the information wasn't suppressed. And that is the right rule. And so that was technically entitled to deference too. But in Hammer's direct testimony, he described the events connected with the Palm Sunday robbery and shooting in great detail. And he repeatedly said that during these events, he, Hammer, was armed with a .41 caliber revolver, and Sadezan at all times was armed with the .22 caliber automatic. He even said that Sadezan was in front of him and began firing at the victim because the victim refused to give up the bank bag with the money. So there was no exchanging of guns. There was no grabbing of guns. Hammer didn't shoot at the victim in this. And so his own testimony actually did impeach this part of Wanner's testimony. Wanner was also 14 years old when he overheard this conversation in 1997. And by 1999, when he testified, he said that his memory had been destroyed. That's the word. He did because of drugs and alcohol. Yes. And we've gone through the long litany of criminal charges. But can we focus on the notes? Because that's the interview notes. Because that's what really is at the heart of the issue raised in the petition with respect to Mr. Wanner's testimony, right? Well, if you're focusing on the piece of paper, the note written by the prosecutor. I call them notes. In the rather testy testimony at the PCRA hearing, I realized Mr. Baldwin characterized it as his interpretation of what was being said. But I guess we're all free to characterize the document we saw for what we see it as. Why wasn't that turned over? Baldwin testified that he didn't turn it over because he considered it work product. How is it work product? His impressions of what the witness was saying to him. I read all of his testimony, some of it with disbelief, to be very honest with you. But the interview notes, which he would not have referred to as notes, interestingly do reflect there was a state trooper present during this interview. I think Mr. Baldwin even disputed that it was an interview. He just wanted to hear what Mr. Hammer had to say, right? So help me please to understand how this interview conversation, whatever it may have been, about which some notes were taken, is work product. When a third party, the Pennsylvania State Police Trooper was present and himself could have taken notes about the same conversation. And that certainly would have been Brady or Giglio, wouldn't it? No, it wouldn't. It wouldn't have been Brady. There's no Giglio issue because that wasn't an issue of promising water or something. Let's focus on the content of the note because that is where the rubber meets the road when it's coming to materiality. When you actually look at the note, it's inculpatory. It confirms that Hammer was confirming what Warner said, that there was a conversation in the barn. As far as Hammer was concerned, Warner could have been there but out of sight. What did the defense know about Warner or his existence back at that time when this conversation, interview, whatever it was? He gave a statement, a signed statement in 1989 that was, of course, turned over in discovery. So the defense was well aware that Warner was going to say what he said about what Hammer said or what Satizan said to Hammer. And, of course, as the state court found, if it was true that Warner was misquoting Satizan, Satizan would have known that. He would have known that Hammer knew it because that was something he knew of his own independent knowledge. He was present for the conversation. It was his own words that were being quoted back by Warner. So if Warner was getting it wrong, Satizan knew it and that affirmation wasn't suppressed. Was it ever established as an issue of fact whether these notes, this recordation of an interview, whatever it was, actually made it into the case file and would have been subject to the district attorney's office's open file policy? As far as a formal finding of fact, I don't think so, but the fact is. Does the record demonstrate that as a fact it ever made it into the open, the file that is supposedly open? It was found in the file when the PCRA court granted discovery. I thought Mr. Baldwin testified that because it was work product, it would not have gone into the office file. No. Isn't that what he testified to? No. What he said was that if he had been supervising the open file review, which was available to the defense but not acted upon, he said if he was supervising the open file review, because he considered that piece of paper to be work product, when they came to that piece of paper, he would have said you can't look at that. He didn't say it wasn't in the file. And when the discovery happened, it was in the file. So this business about him trying to hide it is incorrect because, you know, if you want to hide the aspirin, the last place you put it is the medicine cabinet. I don't know that anybody ever suggested or stated anyway that he tried to hide it. It's just I must confess, having read all of that testimony, I really found it difficult to understand what did happen. Whether where and whether the notes ended up in the open file or whether they were out of it, I was left without a conclusion. I read the testimony and say. Plus, I think there's testimony on page 296 that, yeah, the contents of the notes were actually turned over to the defense, but not just the piece of paper. So, I mean, who knows what happened? I think that was a reference to the fact that Satterson obviously knew what was said in his own conversation and would have known and would have known that Hammer knew if Wanner was getting it wrong. In the end, materiality. In the end, materiality. And the parties didn't consider Wanner to be an important witness. They mentioned him once each in passing in 30 pages of closing argument. We also know that the outcome would have been the same if Wanner didn't testify at all because, of course, that's what happened in the first trial. In the first trial, Wanner was not a witness and Satterson was nevertheless convicted of first degree murder in that case. As to the PCRA testimony in which this claim is based, it makes it clear that Hammer and Wanner actually agree more than they disagree. Hammer confirmed Wanner's account that there was a conversation in the garage in which Satterson was blaming Hammer for the loss of the bag, the bag that the jury knew from the physical evidence contained the .41 revolver and the .22 caliber automatic. So Wanner had memory problems, but his memory problems would recede if this impeachment were used to show that Hammer would be confirming all of these parts other than the statement of Wanner's testimony. So the impeachment would have the unintended effect of making Wanner a stronger witness. It would also tell the jury that when Wanner and Hammer disagreed, as they did on the question of whether or not Satterson had said, I grabbed the gun from you because you missed, Hammer, the jury should believe Hammer, the chief prosecution witness on whose credibility the entire case depends. So Judge Badova and the judges before him were correct in deciding that this was not material under Brady. On the I'll see what I can do claim, as Judge Badova also concluded, that didn't constitute a disclosable agreement or promise under Giglio, saying I'll see what I can do is a polite deflection. It tells the listener that the question will be considered later. The prosecutor didn't say that he – A polite deflection? Polite.  You don't think that there is a reasonable possibility that it could leave the person to whom this statement was made under the belief that at least down the road something would be done or at least considered concerning this other unrelated prosecution? Well, every judge considered the case so far as decided to the contrary that it didn't constitute any kind of agreement. And if it's true – Didn't say agreement. Didn't say agreement. That's a fundamental difference here in this case and some of the others. If this were an agreement, if this were a deal, you'd have a tougher time. But no one's, as far as I know, suggesting that. Under the case law, it's understood that every witness who has an open case is going to probably hope that something is going to come of their – But this is more than hope. This is a statement that was made by Mr. Baldwin. He said, I'll see what I can do. The decision on – Doesn't that suggest that he was stating that he would undertake in an active way something? I suggest the opposite, that he was refusing to take an active role and was saying, I'm not going to talk about this now. Easy to – just to use the word no, right? Sure. But it amounts to the same thing, since he didn't say that he would do anything and he didn't say what he would do if he did anything. The case law supports the district court's conclusion because, for example, of the Ninth Circuit decision, United States v. David, it's unpublished, but the witness says to the prosecutor, what am I going to gain if I give this deposition? And the prosecutor says, I'll see what I can do. Same words that are in question here. In that case, the court held that there was no disclosable promise or agreement under Giglio. In this court's own decision, United States v. Dale v. Williams, the state court tells the witness, if you give up the names of your accomplices, you'll get consideration. That judge would later be the sentencing judge for that witness, but this court held that even though the district court granted the writ, this court reversed because it held that that was not a disclosable promise or agreement. Sazer relies on United States v. Bagley, but he relies on, for the proposition that no actual agreement or promise is needed, he relies on Part III of that court's decision. Part III was joined by only two justices. So Bagley does not constitute a holding that no agreement or promise is necessary under Giglio. And in fact, this court decided that a promise or agreement is necessary in Lesko v. Secretary, which decided just last year. Furthermore, in Bagley, the impeachment, it didn't amount to a signed contract, but it did specify monetary rewards for the witness in the case the defendant was going to be convicted, and that's a far cry from vaguely saying, I'll see what I can do. Also in Bagley, the court remanded on the issue of whether or not the impeachment would likely result in a different outcome. And in this case... Is Bagley really helpful to you, though, just in terms of what it says as to reasonable probability? Yes, because in this case, Judge Badova also agreed with the state court's alternative holding that the impeachment would not have made a difference in the outcome, because Wanner was very much a secondary witness. He was eclipsed by Hammer. Wanner had an open burglary case. The jury knew that and knew he had a reason to be biased in favor of the prosecution. And memory problems. Well, but ten years before, Wanner had given signed statements. That was a softball, sir, but forget it. But I wanted to add that Wanner had given signed statements that were consistent with his testimony at trial. So the idea that his testimony at trial is the product of the supposed agreement doesn't work, because he was saying the same things ten years before when there was no such agreement. Thank you, Your Honors. Thank you, counsel. I can pull up the page, Your Honors, but at trial, Mr. Baldwin asks Mr. Wanner, are you sure you heard that conversation? He says, I'm sure I heard that conversation. In terms of the inducement, it's the end of the direct where Mr. Baldwin goes through with Mr. Wanner. It's the last words the jury hears. Are you expecting anything from it, from this testimony? No, he says. In terms of Bagley, the contract amounts were left blank. It's very similar to this case. And that's from the facts. That's not from three-judge, three-justice holding. But, moreover, Bagley says that the prosecution has to disclose evidence of bias and interest. It's right there. It's in the majority opinion. And that's what we have here is evidence of bias and interest that was not disclosed. In terms of what David Satizan knew or did not know, David Satizan and his lawyer testified, it's in our supplemental appendix, that he did not know about those notes, about the conversation that Mark Baldwin had with Fritz Wanner. He did not know about that. In the state court's holdings, Your Honor, the Pennsylvania Supreme Court relies on the PCRA court. And when Your Honors read through the PCRA court's decision, you'll see that it's riddled, riddled with legal principles that are contrary to or unreasonable determinations of clearly established federal law. And it says the result would not have changed, that type of thing. That's not the law in this state. So, here the state courts are using improper, contrary to, unreasonable federal law to reach a decision against Mr. Satizan. I respectfully request that the court reverse the district court and remand with instructions. Thank you, Your Honors. Thank you, counsel. We thank both counsel. We'll take the case under advisory.